

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CLERK-LAS CRUCES

RICK TAPIA,

        Petitioner,

vs.

CIV. No. 98-100 BB/LCS

TIM LEMASTER, Warden at New
        Mexico State Penitentiary, et al.,

        Respondent.

### PETITIONER'S RESPONSE TO ORDER TO SHOW CAUSE

COMES NOW the Petitioner, Rick Tapia, by and through his attorney, Jane Greek, and submits the following Response to the Order to Show Cause, and specifically to paragraphs 5-8 of the Order, demonstrating that he has submitted information and referred to portions of the record that show his trial counsel's representation fell below an objective standard of representation by failing to introduce exculpatory evidence and failing to exercise peremptory challenges to remove certain jurors, and that these failures prejudiced Mr. Tapia's ability to present a defense so that there is a reasonable probability that, absent counsel's unprofessional errors, the result of the proceeding would have been different. Accordingly, Mr. Tapia has made a sufficient showing that he is either entitled to relief or that he should receive an evidentiary hearing in order to complete the record, as he requests in his Renewed Motion for an Evidentiary Hearing.

### PROCEDURAL HISTORY

On July 28, 1995, Petitioner Rick Tapia was charged by criminal information in the District Court for the County of Mora in the State of New Mexico with an open count of murder, a first



degree felony, and with tampering with evidence, a fourth degree felony. (Record Proper, "R.P.", at 1-2.) On that same day, Anna Aragon, a contract public defender for the State of New Mexico, was appointed to represent Mr. Tapia. (R.P. at 6.)

On November 7, 1995, trial of Mr. Tapia was scheduled for January 16, 1996, in Mora, New Mexico. (R.P. at 29.) On December 1, 1995, Mr. Tapia filed a motion to change venue on the basis of pre-trial publicity and inability to seat an impartial jury. (R.P. at 41-44.) On December 15, 1995, Mr. Tapia requested a continuance of the trial on the grounds that his attorney needed additional time to adequately prepare for trial. (R.P. at 49.) On January 2, 1995, the trial judge denied Mr. Tapia's request for a continuance without making any factual findings. (R.P. at 58.) On January 3, 1996, the trial judge granted the State's petition for a search warrant for 20 cubic centimeters of Mr. Tapia's blood. (R.P. at 56.)

On January 9, 1996, Mr. Tapia filed a motion to dismiss based on the State's failure to disclose exculpatory evidence contained in a statement by Elaine Romero that had been in the possession of the State since July of 1995. (R.P. at 79-80.) On January 11, 1996, Mr. Tapia filed another motion for a continuance on the grounds that the State had not disclosed copies of the lab reports analyzing the knife seized from Mr. Tapia for blood and other evidence. (R.P. at 83.)

A motion hearing was held on January 12, 1996. At that hearing, the trial judge denied Mr. Tapia's motion to dismiss, (1/12/96 T1 at 88)[1], and Mr. Tapia's motion for a continuance, (1/12/96 T1 at 217.) In denying Mr. Tapia's motion for a continuance, the trial judge ruled that evidence

---

[1]There are 54 audiotapes comprising the record in Mr. Tapia's case. The audiotapes are referred to according to their labels, which contain the date and the tape number (e.g. 1/16/96 T1). The tapes were played on a Dictaphone Voice Processor Model 2740 with approximately 407 counts per tape.

2

about whose blood was on Mr. Tapia's knife was irrelevant, but also stated he would declare a mistrial in the event he believed the evidence had become relevant. (1/12/96 T1 at 193-217.)

The judge denied Mr. Tapia's motion for a change of venue after conducting a bifurcated voir dire to determine the extent of the venire's prejudice against Mr. Tapia. (1/12/96 T4 at 295.) In denying Mr. Tapia's motion for change of venue, the judge found the newspaper articles and community discussion had not created an unfair amount of prejudice against Mr. Tapia in the community, but he did not address Mr. Tapia's concern that numerous members of the venire were either related to or friends of the victim, Mr. Martinez. (1/12/96 T4 at 295.) From the venire of 58 potential jurors, 26 were struck by the judge for cause, and two were absent on the day of final jury selection, leaving 30 from which a jury of twelve with two alternates was selected. (R.P. at 91-93.)

Mr. Tapia's trial began on January 16, 1996. On January 19, 1996, after a three-day trial, the jury returned a verdict of guilty of second-degree murder and not guilty of tampering with evidence. (R.P. at 164-65.) Despite Mr. Tapia's request for the preparation of a presentence report, the trial judge set sentencing for February 5, 1996, and indicated his inclination to enhance Mr. Tapia's sentence at that time. (R.P. at 172; 1/19/96 T27 at 246-53.) On February 5, 1996, the trial judge sentenced Mr. Tapia to the maximum term of 15 years imprisonment, and imposed the maximum possible enhancement of five years. (R.P. at 188-90.) The grounds given by the court for the enhancement were the court's belief that Mr. Tapia had perjured himself at trial, that he had lied when he first spoke to the Mora County Sheriff about the incident, that the victim had been stabbed twice, including once in the back, and that he believed Mr. Tapia had poor potential for rehabilitation. (R.P. at 189.) Formal judgment was entered on February 9, 1996. (R.P. at 192.)

3

Mr. Tapia filed his notice of appeal with the State of New Mexico Court of Appeals on March 8, 1996. (R.P. at 193.) Mr. Tapia raised the following issues in his appeal: (1) the trial court's denial of his motion to change venue; (2) the trial court's denial of his motion for a continuance and the resulting ineffectiveness of counsel; (3) the admission of a transcript of a witness' taped statement into evidence despite the State's failure to disclose an audible copy of the tape; and (4) improper enhancement of Mr. Tapia's statement. (R.P. at 202-08.)

On April 24, 1996, Mr. Tapia filed a Motion for Reconsideration of Sentence in light of an evaluation report that was completed after his original sentencing. (R.P. 212.) On April 29, 1996, the trial court denied that motion without a hearing. (R.P. 214.) On November 27, 1996, the Court of Appeals affirmed Mr. Tapia's conviction. (Exhibit G to State's Answer filed April 21, 1998.)

Mr. Tapia filed a Petition for Writ of Certiorari with the New Mexico Supreme Court on December 17, 1996. (State's Answer, Exhibit H.) The Supreme Court denied Mr. Tapia's petition on January 10, 1997, and the mandate was filed on January 27, 1997. (State's Answer, Exhibit I.)

On February 25, 1997, Mr. Tapia filed another motion for reconsideration of sentence. This time the trial court conducted a hearing and received the psychiatric evaluation of Mr. Tapia. However, on July 28, 1997, the trial court again denied the motion and reaffirmed Mr. Tapia's sentence of 20 years.

Mr. Tapia filed a Petition for Writ of Habeas Corpus in the District Court for the State of New Mexico on January 22, 1998, raising the following issues: (1) ineffective assistance of counsel; and (2) unfair trial. (State's Answer, Exhibit J.) This petition was denied on January 26, 1998, (State's Answer, Exhibit K), and the New Mexico Supreme Court denied Mr. Tapia's Petition for a Writ of Certiorari on March 5, 1998. (State's Answer, Exhibit M.)

4

On January 26, 1998, Mr. Tapia filed a Petition for Writ of Habeas Corpus in the United States District Court for the District of New Mexico raising the issues raised in his direct appeal. By its Answer of April 9, 1998, the State of New Mexico moved to dismiss Mr. Tapia's petition on the grounds that it was time-barred, but this motion was denied by the Court on June 29, 1998. On July 1, 1998, the Court appointed the Federal Public Defender to represent Mr. Tapia. On August 6, 1998, the Court ordered that Mr. Tapia's brief-in-chief be filed on or before October 8, 1998. On October 2, 1998, the Court granted Mr. Tapia's unopposed motion for an extension and ordered that Mr. Tapia's brief-in-chief be filed on or before January 6, 1999. On January 5, 1999, the Court granted Mr. Tapia's unopposed motion for an extension of time and ordered that Mr. Tapia's brief-in-chief be filed on or before April 6, 1999.

Mr. Tapia's brief-in-chief was timely filed on April 6, 1999. He also filed a request for an evidentiary hearing. Respondent's answer brief was filed on July 6, 1999. Mr. Tapia filed a reply brief on July 21, 1999. The Magistrate Judge issued Proposed Findings and Recommended Disposition on August 8, 1999. Respondent and Mr. Tapia timely filed objections to the Proposed Findings and Recommended Disposition. The District Court ordered that Mr. Tapia's objections were overruled and Respondent's objections sustained in part and accordingly adopted the Magistrate Judge's Proposed Findings and Recommended Disposition except as modified by the Court's order on September 14, 1999. Pursuant to the Court's order, Mr. Tapia filed a second Petition for a Writ of Habeas Corpus in state court on September 29, 1999. His second petition was denied on February 29, 2000.

On April 5, 2000, Mr. Tapia filed a motion in this Court for an order allowing him to amend his petition. Leave to amend was granted on May 8, 2000. Mr. Tapia filed an amended petition on

July 6, 2000, and Respondent filed an Amended Answer on July 24, 2000. Respondent moved to dismiss the Amended Petition on August 22, 2000. After briefing the issue, the Magistrate Judge issued Proposed Findings and Recommended Disposition on December 4, 2000. The Magistrate Judge also issued an Order to Show Cause on two of Petitioner's issues, directing Petitioner to file a brief by January 30, 2001.

Petitioner filed Objections to the Proposed Findings and Recommended Disposition on December 14, 2000. Respondent's Objections were filed December 15, 2000. Mr. Tapia responded to Respondent's Objections on December 21, 2000. Respondent moved to strike Petitioner's response to Respondent's Objections on January 18, 2001. Mr. Tapia filed a response to the Motion to Strike on January 18, 2001. On January 24, 2001, the district court entered an order adopting the Magistrate Judge's Proposed Findings and Recommended Disposition and dismissing with prejudice Claims 1, 3 and 4, and this Court denied Respondent's Motion to Strike as moot.

This brief is in response to the Magistrate Judge's Order to Show Cause issued on December 4, 2000.

## STATEMENT OF THE FACTS

Rick Tapia was tried and convicted for the murder of Joaquin Martinez during a parking lot brawl involving 8-10 people at the Allsup's in Mora, New Mexico, on July 1, 1995. At trial Mr. Tapia admitted that he had stabbed Joaquin Martinez, but asserted that it was in self-defense because Mr. Martinez had attacked him with a knife. Mr. Martinez suffered two stab wounds, one to the back and the fatal one to the heart. Mr. Tapia testified that he did not know how Mr. Martinez received the wound to the back

6

On July 1, 1995, Rick Tapia was a twenty-one year-old resident of Santa Fe, New Mexico. (1/18/96 T22 at 174.) Mr. Tapia was a graduate of Santa Fe Vocational High School, and had worked in Santa Fe for Industrial Asphalt with his stepfather for four years. (1/18/96 T22 at 191.) Sometime during June of 1995, Mr. Tapia's brother introduced Mr. Tapia to Elaine Romero. (1/18/96 T22 at 190.) Ms. Romero had also attended Santa Fe Vocational High School, but she and Mr. Tapia had not known each other. (1/18/96 T22 at 190.)

On July 1, Elaine called Rick and asked him if he would like to go to the Fiestas in Las Vegas, New Mexico, and to Mora, New Mexico, with her and some of her friends. (1/18/96 T22 at 203.) At this time, Rick and Elaine had been dating a short time. (1/18/96 T22 at 200.) Rick accepted the invitation, and joined Elaine and five friends for the trip. Those friends, Billy Benavidez, Isaac Ortega, Rick Ortega, Andrew Trujillo, and Barbara Carillo, knew Rick from high school, but had not seen him in several years. (1/18/96 T22 at 182-188.) The group picked Rick up that afternoon in Mr. Benavidez' van, and traveled directly to Las Vegas. (1/16/96 T10 at 292.) That night they stayed at a house owned by Andrew Trujillo's cousin. (1/16/96 T10 at 318.)

While in Las Vegas, many members of the group, including Mr. Tapia, stayed up all night playing pool and drinking. (1/18/96 T22 at 224.) Mr. Tapia had only recently been released from an in-patient alcohol treatment program, but by this time he had relapsed. (1/18/96 T22 at 215.) According to Mr. Tapia's testimony, he did not sleep at all that night. (1/18/96 T22 at 225.)

The next morning the group drove up to Mora to visit Rick Ortega's girlfriend at a rehabilitation clinic. (1/18/96 T22 at 232.) They arrived in Mora in the morning and went to the house of Rita Casados, where they were joined by four people from Mora. (1/16/96 T10 at 28, 1/17/96 T11 at 12.) Those people included Cindy Duran, her brother James Duran, Elizabeth

Maestas and her sister Jackie Maestas. After visiting Rick Ortega's girlfriend, who was also Cindy and James Duran's cousin, the entire group traveled to the Fiestas in Las Vegas. (1/17/96 T11 at 12.)

While at the Fiestas, Rick Tapia continued drinking with Rick Ortega, consuming several beers and at least two shots of tequila. (1/18/96 T22 at 248.) Mr. Tapia and Mr. Ortega then joined other members of the group on the rides at the Fiestas before leaving. (1/18/96 T22 at 254.) As the group was getting ready to leave the Fiestas, a fight broke out between several members of the group and other people at the Fiestas. (1/18/96 T22 at 257.) Mr. Tapia suffered a bump on the head, but there were apparently no other injuries. (1/18/96 T22 at 259.) As Mr. Benavidez drove away, the crowd threw something at the van that broke the back window. (1/17/96 T11 at 41.)

Testimony was given at trial that during the fight people from Las Vegas were yelling "westsiders" and that the "westsiders" was a gang in Las Vegas and Santa Fe. (1/17/96 T11 at 28.) There was also testimony that during the fight in Mora later that night, people were yelling either "westsiders" or "eastsiders." (1/16/96 T7 at 185.) Although the prosecution attempted to portray the people from Santa Fe as gang members, no evidence was introduced to support this allegation. On the contrary, each witness who was asked about gang affiliation specifically denied having any such affiliation. (1/17/96 T11 at 34, T13 at 255, T15 at 9; 1/18/96 T21 at 296, T22 at 266.)

As Mr. Benavidez was driving away from the Fiestas, two Las Vegas police officers stopped him because they had received a report about the fight and because Mr. Benavidez was driving the wrong way on the one-way street. (1/17/96 T15 at 208.) When the officers took all of the men out of the van and searched them, they found a marijuana pipe in Mr. Tapia's pocket, but they did not find a knife in his pockets. (1/18/96 T22 at 269.) The officers confiscated the pipe, but they did not make any arrests or issue any citations. (1/18/96 T22 at 269.)

8

After the officers left, Mr. Benavidez drove to Mora to take the people who lived there home. (1/17/96 T11 at 54.) They arrived in Mora at about 11:00 p.m., and Mr. Benavidez stopped at an Allsup's convenience store for gas. (1/17/96 T15 at 235.) Mr. Benavidez got out to put gas in the van, and Isaac Ortega, Andrew Trujillo, Barbara Carillo, James and Cindy Duran, and Jackie and Elizabeth Maestas went into Allsup's to get food or use the restroom. Rick Tapia, Rick Ortega, and Elaine Romero stayed in the van. (1/17/96 T11 at 102, T13 at 17, T14 at 217, and T16 at 157.)

At the time the Santa Fe group arrived at the Allsup's, Joaquin Martinez and his cousin Robert Martinez, Jr., were already there and were sitting in Robert's truck at the far side of the Allsup's building. (1/17/96 T17 at 226.) Joaquin and Robert had been camping, but they had come back into town to try to inflate a tire for Joaquin's car, which had a blowout. (1/17/96 T17 at 267.) Also at the Allsup's when the van arrived were Sandra Garcia, Jesus Valdez, and Mark Montoya. (1/17/96 T18 at 155.) Mark Montoya was making a phone call, and Jesus Valdez was talking to Robert Martinez. (1/17/96 T18 at 342; 1/18/96 T19 at 66.) After the van arrived, Jacqueline Maestas went over and began talking with Joaquin Martinez. (1/17/96 T17 at 253.)

Shortly after the van arrived, Isaac Ortega became involved in an argument with Joaquin Martinez. (1/17/96 T17 at 260.) Robert Martinez, Sr., drove up and jumped out of his truck, and although conflicting evidence was introduced about what he did next, he either hit Isaac Ortega, pushed Joaquin Martinez towards Isaac Ortega, or did nothing more than yell at the people from Santa Fe. (1/17/96 T17 at 260.) Robert Martinez, Sr., testified he did not do anything, but Isaac Ortega testified Mr. Martinez hit him, and Sandra Garcia, Mark Montoya, and Andrew Trujillo confirmed his testimony. (1/17/96 T12 at 129, T14 at 58, T18 at 138 and 242; 1/18/96 T19 at 165.)

9

Isaac Ortega testified that after Robert Martinez, Sr., hit him, he, Isaac, ran back to the van to get his brother. (1/17/96 T12 at 132.) Rick Ortega then got out of the van and a free-for-all ensued in the parking lot involving Rick Ortega, Isaac Ortega, Robert Martinez, Jr., Robert Martinez, Sr., Joaquin Martinez, Andrew Trujillo, Jesus Valdez, and, at some point, Rick Tapia. (1/17/96 T13 at 40, T14 at 218, T18 at 360; 1/18/96 T19 at 202.) The fight ended when the participants and other witnesses saw Joaquin Martinez lying on the ground bleeding and everybody from Santa Fe running to the van. (1/17/96 T14 at 218.) Once in the van, Rick Tapia tearfully acknowledged stabbing Joaquin Martinez, saying that he had no choice and "it was either him or me." (1/17/96 T16 at 248.)

Barbara Carillo was the only witness who testified she saw Joaquin Martinez and Rick Tapia fighting. Ms. Carillo testified that she came out of the store and saw Joaquin Martinez with a knife in his hand, and that Rick Tapia was able to stab him with it. (1/17/96 T14 at 268.) The only other testimony regarding the fight between Mr. Tapia and Joaquin Martinez was Mr. Tapia himself, who testified he had turned Mr. Martinez' knife on him after being attacked by Mr. Martinez. (1/18/96 T23 at 5.) Mr. Tapia testified that when he got out of the van, the fight had already started and that he saw Mr. Martinez coming at him with a knife. When Mr. Martinez reached him they both tumbled to the ground. (1/18/96 T23 at 6.) Mr. Tapia testified he was able to grab Mr. Martinez' arm with both hands and turn the knife back into Mr. Martinez and stab Mr. Martinez in the chest. (1/18/96 T23 at 25.) Mr. Tapia was not able to explain the knife wound in Mr. Martinez' back. (1/18/96 T24 at 125.) At trial the state's medical examiner testified that the stab wound to the chest was fatal, having pierced the left ventricle of Mr. Martinez' heart. (1/18/96 T20 at 245.)

Rita Sandoval, a witness who arrived at the Allsup's during the fight, testified that she saw Joaquin Martinez in the middle of two people fighting, although she did not identify Rick Tapia as

either of those two people. (1/16/96 T6 at 194, 215.) Josieann Trujillo, Rita Sandoval's sister, was also present and testified that she saw Joaquin Martinez trying to cover himself because there were "a bunch of people on him." (1/16/96 T7 at 106.) James Duran was not called as a witness at trial, but in his statements to police and to defense investigators, he stated that during the fight a bloody knife flew through the air from the area where Joaquin was fighting and landed at James' feet.

After Mr. Martinez was stabbed, Mr. Tapia and his friends fled in the van. (1/18/96 T21 at 239.) They went back to Rita Casados' house, where Mr. Tapia changed his shirt and pants because his were blood-soaked. (1/18/96 T23 at 45.) His boxer shorts were also blood-soaked, but he did not change out of them. (1/18/96 T23 at 71, 81.) During the drive to Ms. Casados' house and during the time at the house, Mr. Tapia was heard to repeatedly say that he had no choice and that "it was either him or me." (1/17/96 T12 at 321.)

Mr. Benavidez drove back to Santa Fe through Angel Fire, New Mexico. (1/17/96 T16 at 41.) When they arrived back in Santa Fe, they dropped Elaine Romero off at her house. (1/18/96 T21 at 262.) Ms. Romero testified at trial that when she got out of the van, she gave Mr. Tapia back his knife, which had been in her purse since the previous day. (1/18/96 T21 at 262.) Shortly after Ms. Romero was dropped off, the Santa Fe Police found and stopped the van. (1/18/96 T23 at 63.) When they removed the occupants and searched them, the police found a pocketknife in Mr. Tapia's front right pocket. (1/16/96 T8 at 278.) Ms. Romero identified this knife as the one which had been in her purse during the fight in Mora and which she had returned to Mr. Tapia upon their arrival in Santa Fe. (1/18/96 T21 at 220, 262.) Later testing determined that there was blood on that knife consistent with Joaquin Martinez' blood. (1/18/96 T19 at 257.)

11

Mr. Tapia was arrested and transported to Mora, where he gave a statement to the sheriff in which he claimed to have been asleep during the entire incident. (1/18/96 T23 at 102.) A transcript of that statement was admitted at trial, even though the original tape was entirely inaudible. (1/16/96 T10 at 66.)

**I. PETITIONER HAS PRESENTED EVIDENCE DEMONSTRATING THAT HIS SIXTH AMENDMENT RIGHT TO COUNSEL WAS ABROGATED BY HIS ATTORNEY'S FAILURE TO INTRODUCE EXCULPATORY EVIDENCE AND TO EXERCISE REMAINING PEREMPTORY CHALLENGES TO REMOVE JURORS WITH CONNECTIONS TO THE VICTIM, AND THAT THE RESULT OF HIS TRIAL IS UNRELIABLE BECAUSE OF HIS COUNSEL'S CONSTITUTIONALLY INEFFECTIVE PERFORMANCE.**

**A. INTRODUCTION.**

In response to paragraphs 6-8 of the Order to Show Cause, Mr. Tapia asserts that he has presented citations to the record, additional information, and authorities to support his claim the he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel failed to present evidence at trial that would have supported Mr. Tapia's self-defense claim. This evidence would have shown that a different knife, rather than his knife, was the weapon involved in the fight. Additionally, there was evidence that, if presented at trial, would have allowed Mr. Tapia to explain both the stab wound in Joaquin Martinez's back and the possible source and fate of the actual murder weapon, areas that were key problems with his defense. The specific evidence of the second knife was James Duran's statement to the police that, during the fight, a bloody knife flew through the air and fell at his feet. This evidence, combined with Elaine Romero's testimony that Rick Tapia's knife was in her purse throughout the time of the fight, would have negated the State's theory of the case that Rick Tapia introduced a knife into the fight. Combined with other

12

evidence concerning Andrew Trujillo's actions that was also not presented at trial, the defense would have been able to articulate a reasonable, believable theory for how Joaquin Martinez received the second stab wound and why the actual murder weapon was not found.

In response to paragraph 5 of the Order to Show Cause, Mr. Tapia also has submitted citations to the record demonstrating that two jurors with connections to the victim were seated on the jury, and Mr. Tapia's trial counsel did not use any of her remaining peremptory challenges to remove these jurors.

As a result of trial counsel's failures to present and argue the exculpatory evidence and her failure to remove these two jurors, counsel's performance was constitutionally ineffective and outside the accepted range of professional conduct. Furthermore, but for counsel's unprofessional errors, the outcome of his trial would have been different.

## B.    RELEVANT LAW.

The Sixth Amendment's guarantee of a criminal defendant's right to assistance of counsel is one of the primary safeguards "necessary to insure fundamental human rights of life and liberty." Johnson v. Zerbst, 304 U.S. 458, 462 (1938). Because of the primacy of this right, it is secured to all state defendants by the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 342 (1963). Indeed, of all the rights secured to criminal defendants by the Constitution, perhaps none is so fundamental to a fair trial as the right to assistance of counsel. See United States v. Cronic, 466 U.S. 648, 654 (1984)("[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.")

Inherent in the right to the assistance of counsel is the assumption that the performance of counsel will be both competent and effective. McMann v. Richardson, 397 U.S. 759, 771 (1970).

13

"If the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel." 397 U.S. at 771. Under certain circumstances, counsel's failure or ineptitude is so great as to cast the validity of a defendant's conviction irredeemably into doubt. Strickland v. Washington, 466 U.S. 668, 687 (1984). A habeas petitioner is entitled to relief for ineffective assistance of counsel once he has demonstrated that the performance of his attorney at trial was deficient in that counsel was not reasonably competent as judged by the competence demanded of attorneys in criminal cases, and that the deficient performance prejudiced the defense. Id.; Kimmelman v. Morrison, 477 U.S. 365, 382 (1986).

The Supreme Court has stated:

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 690. Most importantly, the Supreme Court has cautioned that:

> in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although these principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the

14

particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

466 U.S. at 696. In other words, the fundamental fairness of the adversary proceeding is the touchstone for determining constitutional ineffectiveness of counsel.

Counsel's failure to investigate before trial can constitute ineffectiveness. See Kimmelman v. Morrison, 477 U.S. 365, 385 (1986). Furthermore, competent performance in other areas of the trial cannot cure constitutional ineffectiveness in one area. 477 U.S. at 386-87.

To demonstrate prejudice, the petitioner is not required to prove that a different result would have occurred. Rather, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In other words, "the defendant must show that [counsel's errors] actually had an adverse effect on the defense." 466 U.S. at 693. Petitioner is not required to demonstrate he would have been acquitted had counsel not been ineffective. See Strickland, 466 U.S., at 693 ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland"). In this case, Petitioner has shown his trial was fundamentally unfair and he was denied effective assistance of counsel.

## C. Exculpatory Evidence.

The performance of Mr. Tapia's counsel must be considered in the light of the strength of the state's case against Mr. Tapia. United States v. Rivera, 900 F.2d 1462, 1474 (10th Cir. 1990).

The State's case against Mr. Tapia was not a strong one, and there is a reasonable probability that had counsel been effective, the result at trial would have been different. Despite all of the witnesses to the fight in the Allsup's parking lot, none offered any testimony to directly support the state's case. No witnesses testified they saw Rick Tapia get out of the van with a knife in his hand, stab Joaquin Martinez in the back and then stab him again in the chest when he turned around. There were no witnesses at trial who disputed Mr. Tapia's claim of self defense, other than to say they did not see a second knife. There was no evidence as to when or by whom Joaquin Martinez was stabbed in the back. Indeed, the only eyewitness to the altercation between Mr. Tapia and Mr. Martinez corroborated Mr. Tapia's claim of self-defense. The state's case was not a strong one, but rather was one which relied on the passions of the community and the jury. It is in light of this case that counsel's performance must be evaluated, and it is in light of this that it must be deemed to have been ineffective in violation of the Sixth Amendment.

Twenty-one people, in addition to Mr. Tapia, witnessed or were involved in the fight in the Allsup's parking lot. However, only one, Barbara Carillo, saw anything happen between Mr. Tapia and Joaquin Martinez, and her testimony supported Mr. Tapia's claim of self-defense because she actually saw a knife in Joaquin Martinez's hand and saw Mr. Tapia use that knife to stab Joaquin Martinez by turning it on him. Other witnesses had bits and pieces of information that could be used to either support or undermine Mr. Tapia's defense, but many facts that would have supported Mr. Tapia's defense were not presented. Had they been presented, the evidence presented at trial could have been viewed in a wholly different light and Mr. Tapia's defense made much stronger. His credibility was the key to his defense, and any evidence that bolstered his self-defense claim was

16

vitally important.  In failing to present these facts, counsel was constitutionally ineffective and Mr. Tapia's defense was prejudiced as a result.

### 1.    James Duran

James Duran witnessed Joaquin Martinez fighting, and Mr. Duran told police that while Joaquin was fighting, a folding knife flew from where Joaquin was and landed at Mr. Duran's feet. Mr. Duran also told the police that when he picked the knife up, he noticed that it had blood on it and so he dropped it.  Lastly, Mr. Duran told the police that he did not know what happened to the knife after that.  (See Exhibit A.)

This testimony, if introduced, would have been proof that a second knife was at the scene of the fight, particularly if Mr. Duran had testified that the knife seized from Rick Tapia was not the knife which he had picked up.  In addition, Mr. Duran's testimony could have corroborated Elaine Romero's testimony that Rick Tapia's knife could not have been involved in the fight because his knife had been in her purse all evening and was not returned to Rick Tapia until he was dropped off in Santa Fe.  Furthermore, James Duran's evidence that he dropped the knife back onto the ground when he saw it had blood on it would have provided a possible explanation for the stab wound on the victim's back–he may have rolled over on the knife while it was on the ground, or someone else may have picked it up in the melee, or he may have already been stabbed in the back before Rick Tapia ever entered the fight.

However, even though James Duran's statement was apparently in the possession of defense counsel, James Duran was not investigated nor was he called as a witness.  There is no reasonable strategic reason for not presenting this evidence at trial.  Without Mr. Duran's testimony, key inculpatory facts could not be explained to the jury nor at sentencing.  Although Mr. Tapia claimed

17

that Joaquin Martinez produced the knife involved in the fight, the only knife presented at the trial was indisputably Mr. Tapia's. James Duran's testimony would have been valuable exculpatory evidence and given the jury a reason to believe Mr. Tapia's self-defense claim. It would also have greatly bolstered Elaine Romero's testimony that a knife other than Mr. Tapia's was the murder weapon because Mr. Tapia's knife was in her purse the entire evening. Unfortunately, the jury was not able to consider any of these possibilities because they did not learn what James Duran saw. Mr. Tapia's defense was seriously prejudiced as a result.

### 2. Barbara Carrillo

Barbara Carillo was the only witness who saw Joaquin Martinez and Rick Tapia fighting. Although she testified she saw Joaquin Martinez with a knife in his hand and that Rick Tapia was able to stab him with it, she could not testify regarding who introduced the knife into the fight. However, she did have some evidence that could have explained what happened to the knife after Joaquin Martinez was stabbed and whose knife it may have been. Barbara Carrillo stated to a defense investigator that, after Joaquin Martinez had been stabbed, she saw Andrew Trujillo go over and pick him up under the arm to look at his face. (See Exhibit B.) For no discernible reason, this evidence was not introduced even though a key component of the State's theory was that the only knife involved in the fight was Rick Tapia's, a theory bolstered by Rick Tapia's inability to explain what could have happened to a second knife and by the fact that only Rick Tapia's knife was introduced at trial. However, evidence that Andrew Trujillo was the first person to move Joaquin Martinez after the stabbing would have let the defense explain what could have happened to the knife that Mr. Duran and Ms. Maestas saw fly through the air, the knife with which Mr. Tapia said he was attacked, the knife which the prosecution argued never existed. If the knife Mr. Duran and

18

Ms. Maestas saw was lying on the ground, Mr. Martinez may have rolled or fell on to it. If the knife was Andrew Trujillo's knife, he would have had a motive to remove it. Without this evidence, Mr. Tapia could not explain the stab wound in the victim's back, seriously undermining his self-defense claim, but with this evidence, key facts could be explained. There was no strategic reason to not present this evidence at trial, and failure to do so prejudiced Mr. Tapia's ability to fully present his defense.

### 3. Christy Sandoval

Christy Sandoval, an eyewitness who told police that she saw two or three guys fighting with Joaquin at one point, also was not called to testify at trial. She told police that one of the guys fighting Joaquin was tall, in a white T-shirt with light-colored pants, a description which fits that of Andrew Trujillo, who was 6 feet tall and was wearing a white T-shirt and tan pants. (See Exhibit C; 1/17/96 T14 at 164.) Again, this would have given the jury the opportunity to conclude that at least Mr. Martinez' back wound was inflicted by someone other than Mr. Tapia and that the knife which killed Mr. Martinez was not the one seized from Mr. Tapia, but one introduced into the fight by Mr. Martinez or some other participant. This evidence would have been particularly valuable combined with Barbara Carrillo's testimony that Andrew Trujillo lifted Joaquin Martinez up under his arm to look at his face. There was no valid strategic reason for not presenting this evidence.

The evidence not introduced at trial would have given the jury a basis to believe Rick Tapia's testimony by corroborating other witnesses and explaining key details that Rick Tapia could not. Evidence that other people were fighting with Joaquin Martinez and that a knife was involved before Rick Tapia ever got out of the van would have undermined the State's position that Mr. Tapia was responsible for introducing a knife into the fight. Instead, the jury would have been able to conclude

19

that the knife was introduced into the fight by someone such as Andrew Trujillo, whose prior conviction was for aggravated assault with a knife, another fact the jury never learned. Furthermore, Barbara Carrillo's testimony that she saw Joaquin Martinez with a knife and Rick Tapia was able to stab him with it was uncontradicted by any other witness to the fight and bolstered Mr. Tapia's claim of self-defense. The key facts undermining Mr. Tapia's defense were the second stab wound in the victim's back and his inability to produce another knife that could have been the murder weapon. However, there was no evidence concerning when that stab wound occurred. If the jury had learned that James Duran had seen another knife at the scene, that Andrew Trujillo had a prior conviction for assault with a knife, that Andrew Trujillo had been fighting with the victim before Rick Tapia became involved, and that Andrew Trujillo had an opportunity to remove the knife from the vicinity of the victim immediately after the stabbing, it may well have accepted Mr. Tapia's claim of self-defense and acquitted Mr. Tapia of murder. However, because these key pieces of exculpatory evidence were not presented to the jury, the jury was precluded from considering any of these possibilities. There was no apparent strategic reason for the exclusion of this evidence, and Mr. Tapia's defense was severely prejudiced as a result.

Not only did his counsel's ineffectiveness prejudice Mr. Tapia's trial, it also affected his sentencing. In sentencing Mr. Tapia to the maximum possible term of fifteen years and the maximum possible aggravation of five years, the trial court relied upon the following three conclusions:

    (1) Joaquin Martinez was stabbed in the back;
    (2) Joaquin Martinez was stabbed twice; and

20

(3) Mr. Tapia had perjured himself when he testified that he acted in self-defense.[2] The sufficiency of the evidence supporting each of these three factors would have been greatly undermined had counsel brought the evidence listed above to the attention of the trial court and if counsel had emphasized other evidence that was in fact introduced.

The conclusion that Mr. Tapia stabbed Joaquin Martinez twice, once in the back, would have been greatly undermined by the evidence that Joaquin Martinez was fighting with other people and that a bloody knife was seen prior to the fatal encounter between Mr. Tapia and Mr. Martinez. As discussed above, testimony from James Duran, Jackie Maestas, and Christy Sandoval would have allowed counsel to provide reasonable explanations for how Mr. Martinez received the back wound, a wound that Mr. Tapia denied making and could not explain. However, counsel also failed to emphasize of the sentencing court highly relevant evidence that was introduced at trial that would have undermined the trial court's conclusions.

For example, Rita Sandoval testified at trial she saw Joaquin between two people fighting. One guy was in front of Joaquin and one guy was behind Joaquin. Counsel failed to elicit at trial, however, Ms. Sandoval's statement to the police that she saw Joaquin fighting with a short chubby guy in a white T-shirt and black pants, a description consistent with Isaac Ortega, who was 5/5" and 165 lbs. and wearing a white T-shirt and black pants. (See Exhibit D.) Josieann Trujillo also testified she saw a bunch of people on Joaquin. This evidence would have supported a defense theory that the knife actually used in the fight belonged to someone other than Mr. Tapia and that

---

[2]The trial court also cited as aggravating factors Mr. Tapia's perceived poor chance for rehabilitation and the fact that Mr. Tapia lied in his initial statement to the police. There is no reason to believe that the trial court could have aggravated Mr. Tapia's sentence based solely on these two factors if the other three factors were not present.

21

it was possible Mr. Martinez was stabbed in the back before Mr. Tapia entered the fight. With an alternative explanation for the stab wound in the back, the trial court's belief that Mr. Tapia perjured himself by claiming self-defense and denying he stabbed Mr. Martinez in the back would have unsupportable.

The state's case against Mr. Tapia was not strong, and there is a reasonable probability that had counsel been effective, the result at trial would have been different. Had trial counsel presented the testimony of James Carrillo and Christy Sandoval, and the additional observations of Barbara Carrillo, other evidence would have appeared in a materially different light and Mr. Tapia's self-defense claim would have been bolstered. He would have plausibly been able to counter the state's position that he and only he introduced a knife into the fight. Mr. Tapia also would have been able to provide plausible explanations for the source of the victim's back wound and for the fate of the knife he claimed Joaquin Martinez possessed. Without this evidence, Mr. Tapia's defense was like a table missing a leg. He should receive a new trial at which he can present this exculpatory evidence.

### D.    Unused peremptory challenges

Mr. Tapia's trial was rendered fundamentally unfair by counsel's failure to ensure that the jury panel was composed only of unbiased jurors. Two jurors were seated who had connections to the victim's family or to the state's witnesses, yet counsel failed to strike those jurors despite the fact that she had four peremptory challenges remaining. There was no apparent strategic reason for the failure to strike these jurors.

From the venire of 58 potential jurors, 26 were struck by the trial judge for cause, two were absent on the day of final jury selection, leaving only 30 from which a jury of twelve with two

22

alternates was selected. (R.P. at 91-93.)   At the conclusion of the first part of the voir dire, twenty-three of the fifty-eight panelists had been excused for cause by the court.  Twenty-one of those twenty-three were excused because they had formed opinions about the case, were related to the victim or knew the victim, or could not be fair to the defendant for some other reason.[3]  After both stages of the voir dire had been completed, twenty-six of the fifty-eight panelists had been excused by the trial court for cause.  Twenty-three of those twenty-six were excused because they had formed opinions about the case or about the defendant.  In other words, 40% of the jury panel (23 of 58) had to be excused because it could not give Mr. Tapia a fair trial.  Once voir dire was completed, Mr. Tapia only had thirty panelists left from the original fifty-eight from which to select his jury.  As the assistant district attorney acknowledged during voir dire, Mora County is a very small community where almost everyone knows each other by face, by name, or by family.  (1/11/96 T1 at 287.)  As a result, 40% of the jury panel had to be excused for cause.  But even with that high percentage excused for cause, at least two jurors were seated who had connections to people involved in this case.  Connie Martinez was a neighbor of Robert Martinez, Sr. and Jr.  (1/16/96 T1 at 138.)  Mary Martinez was an acquaintance of the victim's grandmother.  (1/11/96 T4 at 3.)  Petitioner's counsel did not challenge these jurors for cause or seek to use any of her four remaining peremptory challenges upon them.  There is no reasonable explanation for accepting these two jurors with connections to the victim's family when counsel had peremptory challenges available.  Mr. Tapia was prejudiced as a result of having two arguably biased jurors on his panel.

---

[3]Of the other two that were excused during the first stage of voir dire, one was challenged by the district attorney for cause, and the other was excused for hardship due to work. (1/11/1996 T5 at 1, 309.)

## CONCLUSION

For the reasons stated above, Petitioner Rick Tapia requests this Court to grant his writ of habeas corpus, vacate his sentence, and order his immediate release from Respondent's custody, or, in the alternative, grant Petitioner's Renewed Motion for an Evidentiary Hearing, filed with this Response, and hold an evidentiary hearing for Petitioner to supplement the record with additional evidence to establish his claims for relief.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER

JANE GREEK
Attorney for Petitioner
Assistant Federal Public Defender
107 East Lohman
Las Cruces, NM 88001
(505) 527-6930

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing pleading was mailed by first-class mail, postage prepaid to Assistant Attorney General Patricia Gandert at the New Mexico Attorney General's Office, P.O. Drawer 1508, Santa Fe, NM 87504-1508 on this 30th day of January, 2001.

JANE GREEK

24

THE EXHIBITS ATTACHED TO THIS

PLEADING ARE TOO VOLUMINOUS TO

SCAN.  SAID EXHIBITS ARE ATTACHED

TO THE ORIGINAL PLEADING IN THE

CASE FILE WHICH IS LOCATED IN THE

RECORDS DEPARTMENT,  U.S.

DISTRICT COURT CLERK'S OFFICE.